SO ORDERED.

Dated: December 18, 2020

Daniel P. Collins, Bankruptcy Judge
_____

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Proceedings |
| | ) | |
| KINSER GROUP LLC, | ) | Case No. 2:20-bk-09355-DPC |
| | ) | |
| Debtor. | ) | |
| | ) | UNDER ADVISEMENT ORDER ON |
| | ) | HOTEL VALUATIONS |
| | ) | |
| | ) | [NOT FOR PUBLICATION] |
| | ) | |

Before this Court is the Motion ("Valuation Motion") of Kinser Group, LLC ("Debtor") to Determine Secured Claim of First Financial Bank Pursuant to Fed. R. Bankr. P. 3012 and Request for Evidentiary Hearing.[1]

For the purposes of the Valuation Motion, the parties have agreed First Financial Bank ("Bank") holds perfected first lien positions in the amount of $7,503,234.29,[2] as of August 14, 2020 ("Petition Date"), against a Bloomington, Indiana Holiday Inn and an adjacent Comfort Inn, together with accompanying personal property (collectively the "Hotels"). For the purposes of the Valuation Motion and Debtor's pending third amended chapter 11 plan[3] (the "Plan"), the parties have agreed that the October 7, 2020 ("Valuation Date") valuation of the Hotels will control the amount of the Bank's secured claim and unsecured claim, if any.

After hearing testimony from one of the Debtor's principals, Kenneth Edwards ("Edwards"), and Debtor's valuation expert, Randall Clemson ("Clemson") of Kidder Mathews, and the Bank's valuation expert, Rajesh Shah ("Shah") of Cushman Wakefield, this Court now

---

[1] DE 55. "DE" means docket entry in the administrative case in this bankruptcy proceeding pending at Case No. 2:20-bk-09355-DPC (the "Bankruptcy Case").
[2] DE 109, p.3, ¶ 8.
[3] DE 124.

1

determines that, as of Valuation Date, the Holiday Inn and accompanying personal property (the "Holiday Inn") had a fair market value of $3.9 million, while the Comfort Inn and accompanying personal property (the "Comfort Inn") had a fair market value of $1.848 million. The Bank's secured claim, therefore, totals $5.748 million and its Petition Date unsecured claim totaled $1,755,234.29.

## I. BACKGROUND

Debtor filed its voluntary chapter 11, Subchapter V, bankruptcy petition on the Petition Date. When the Bank challenged Debtor's qualification as a Subchapter V debtor, the Court eventually sustained the Bank's objection[4] holding that Debtor did not qualify for Subchapter V. Since then, this case has proceeded as a standard chapter 11 bankruptcy.

The Court approved Debtor's chapter 11 disclosure statement[5] and set its Plan for a confirmation hearing on January 4, 2021 at 11:00 a.m. The Bank has until 14 days after the entry of this Under Advisement Order to make its election under Section 1111(b).[6]

In an effort to determine how to treat the Bank's secured and unsecured claims in its Plan, Debtor filed the Valuation Motion on September 8, 2020.[7] The Court has found no pleading from the Bank responding to the Valuation Motion. Rather, at the Court's September 10, 2020 hearing it was announced that the Debtor and Bank had worked out a schedule as to how to proceed.[8]

The parties filed their Joint Pretrial Statement for Valuation Hearing.[9] This Court heard the parties' evidence on November 10 and 24, 2020. At the commencement of the trial the Court denied Debtor's Motion in Limine[10] which sought to bar the introduction of the Bank's appraisal and the testimony of Shah based on, among other things, Federal Rule of Evidence 702 and

---

[4] DE 85.
[5] DE 126.
[6] *Id.* at paragraph 3, pages 3 and 4. Unless otherwise noted, statutory sections cited reference the Bankruptcy Code found at Title 11 of the United States Code.
[7] DE 55.
[8] DE 63.
[9] DE 109.
[10] DE 110.

2

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). At the conclusion of the trial the Court took the matter under advisement.

## II. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157(b)(2)(K) and 1334.[11] The Bank has not contested this Court's jurisdiction to enter a final order on the Valuation Motion and, therefore, has consented. See L.R. 9014-2.

## III. LEGAL ANALYSIS

Under § 506(a)(1):

> [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property…and is an unsecured claim to the extent that the value of such creditor's interest…is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The burden of proof under § 506(a) is on the creditor.[12]

In 1997, the U.S. Supreme Court had occasion to examine whether, under § 506(a), the appropriate standard of valuation for a creditor's collateral was foreclosure value or replacement value.[13] Overruling the 5th Circuit, the Supreme Court held the § 506(a)(1) phrase referring to the "creditor's interest in the estate's interest in such property" identifies what a bankruptcy court "[m]ust evaluate, but it does not say more; it is not enlightening on how to value collateral."[14] However, the Supreme Court recognized "[t]he second sentence of § 506(a) does speak to the

---

[11] Debtor's Valuation Motion, p.2.
[12] *Wheeling & Lake Erie Ry. Co. v. Keach* (*In re Montreal, Maine & Atlantic Railway, Ltd.*), 956 F.3d 1, 16 (1st Cir. 2020) (This is a case worth reading if but for its citing the notable Scottish poet Robert Burns.).
[13] *Associates Commercial Corporation v. Rash*, 117 S.Ct. 1879 (1997).
[14] *Id.* at 1885.

3

*how* question. 'Such value,' that sentence provides, 'shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.'"[15]

The *Rash* court went on to determine that the proposed disposition or use in the debtor's plan "[i]s of paramount importance to the valuation question."[16] In *Rash*, the chapter 13 debtor's plan proposed to use the debtor's Kenworth tractor truck in his trucking business rather than surrendering it to the creditor.[17] The Supreme Court decided that, since surrendering the collateral was not contemplated, the collateral must be valued at a replacement value standard, which under the facts of *Rash*, was understood to be considerably higher than a foreclosure value standard.[18]

Twenty years after *Rash*, the Ninth Circuit Court of Appeals addressed a case where the foreclosure value of an apartment building would be nearly double the value of the building's replacement value because the property was restricted by various agreements requiring its use as low income housing.[19] Those use restrictions, however, would be eliminated upon foreclosure.[20] The debtor's chapter 11 plan proposed to continue using the property as a low-income tax credit property.[21] The Ninth Circuit declared it would "[t]ake the Supreme Court at its word and hold, as *Rash* teaches, that § 506(a)(1) requires the use of replacement value[22] rather than a hypothetical value derived from the very foreclosure that the reorganization is designed to avoid."[23] *Sunnyslope* found *Rash* to be in line with the Ninth Circuit's pre-*Rash en banc* decision holding that "[w]hen a Chapter 11 debtor or a Chapter 13 debtor intends to retain property subject to a lien, the purpose of a valuation under section 506(a) is not to determine the amount the creditor

---

[15] *Id.*
[16] *Id.*
[17] *Id.* at 1886.
[18] *Id.* at 1885. The Supreme Court's *Rash* decision has not been universally applauded. *See, e.g., United Air Lines, Inc. v. Reg'l Airports Imp. Corp.,* 564 F.3d 873 (7th Cir. 2009); *In re Heritage Highgate, Inc.,* 679 F.3d 132 (3d Cir. 2012).
[19] *In re Sunnyslope Housing Ltd Partnership*, 859 F.3d 637 (9th Cir. 2017) (*en banc*).
[20] *Id.* at 642.
[21] *Id.* at 641-42.
[22] The Ninth Circuit noted at FN 2 that the term "replacement" value is synonymous with "fair market" value. See also *In re Taffi*, 96 F.3d 1190, 1192 (9th Cir. 1996) (*en banc*), where the Court noted that "fair market value is the price which a willing seller under no compulsion to sell and willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time."
[23] *Id.* at 640.

4

Case 2:20-bk-09355-DPC    Doc 156    Filed 12/18/20    Entered 12/18/20 17:55:17    Desc
Main Document    Page 4 of 17

would receive if it hypothetically had to foreclose and sell the collateral"[24] since it was not contemplated by the debtor's plan that the collateral would be foreclosed.

For the purposes of this Order, the Court equates the "replacement value" of *Rash* with the fair market value of the Hotels on the Valuation Date in an "as is" condition.

"Because the evaluation of property is less than an exact science,"[25] when Bankruptcy Courts are called upon to value estate properties, they are given "wide latitude."[26] The Court is not strictly "bound by valuation opinions or reports submitted by appraisers and may form its own opinion as to the value of property . . ."[27]

As this Court notes below, all of the witnesses in this matter testified that a hotel's ability to generate net revenues for its owners is the principal factor driving the market value of the hotel. This is what investors focus upon when buying and selling hotels. Since a hotel's net operating income ("NOI") and the capitalization rates applied by an appraiser to those NOI's are figures estimated by an appraiser in utilizing the so-called the Income Approach to valuation, the Court must closely examine the appraisers' assumptions.[28]

### IV. TESTIMONY AND EXHIBITS INTRODUCED AT TRIAL[29]

The Debtor called two witnesses at trial, namely Edwards and Clemson. Their testimony is summarized as follows:

A. <u>Edwards' Testimony</u>

Edwards is one of the owners of Century Hospitality, 50% owner of the Debtor. He is the Debtor's managing member. He also owns Tri Star Hotel Management, a full-service hotel management company that manages both Hotels. Either Edwards or his entities have managed at least 70 hotels in 17 states across the United States. He has been in the hospitality business for

---

[24] *Id.* at 643 (citing *In re Taffi*, 96 F.3d 1190, 1192 (9th Cir. 1996).
[25] *In re 210 Ludlow Street Corp.*, 455 B.R. 443, 447 (Bankr. W.D.Pa. 2011).
[26] *Id. See also In re Buena Vista Oceanside, LLC*, 479 B.R. 342, 346 (Bankr. W.D.Pa. 2012).
[27] *See In re 210 Ludlow Street Corp.*, 455 B.R. at 447.
[28] *In re Hotel Associates, LLC*, 340 B.R. 554, 557-58 and 561 (Bankr. D.S.C. 2006).
[29] This Under Advisement Order stands as this Court's conclusions of law and findings of fact under Bankruptcy Rules 7052 and 9014.

many, many years. Among other roles, for 14 years he served on numerous Intercontinental Hotel Group's ("IHG") committees which dealt with subjects such as hotel branding and direct sales. IHG currently owns the Holiday Inn hotel brand.

The Debtor bought both Hotels in January of 2017 when there were only 990 to 1,000 hotel rooms available in Bloomington, Indiana. Now there are about 2,900 rooms in this market. Bloomington itself has experienced a relatively static population and visitor growth. Edwards described the Debtor's Holiday Inn as a 118-room hotel with a restaurant located at 1710 Kinser Pike in Bloomington, Indiana.

Edwards testified that some of the primary pricing metrics in valuing a hotel are occupancy, average daily rate ("ADR") and "RevPar." RevPar is defined as occupancy times ADR.[30] The STAR Report or STAR Survey is an important publication if one wishes to obtain information about a hotel's performance. That report also helps a hotel operator understand how a given hotel performs relative to its competition.

Edwards described for the Court the term Property Improvement Plan ("PIP") and when a given hotel brand requires a licensee to freshen up or more fully rehabilitate a licensee's hotel property. While indicating that the Holiday Inn and Comfort Inn license agreements both require periodic PIPs, Edwards testified that neither of the Hotels are presently contractually required to satisfy a PIP, nor would a sale of either of the Hotels necessarily require a PIP in order for the brand to approve a buyer's assumption of the brand's flag. Debtor's Holiday Inn license agreement expires in May 2022, while the Comfort Inn license agreement expires in 2028. The Holiday Inn license agreement can require the Debtor to do a brand upgrade and/or renovations.[31] The same is true with the Comfort Inn agreement.[32]

Debtor's Plan calls for the Hotels to set aside capital reserves of 4% per year from 2021 through 2023. In 2024 and 2025, the Debtor's Plan calls for the owners to make a $300,000

---

[30] For example, RevPar would equal $100 if occupancy were 10% and room rates were $1,000 per night.
[31] Ex. V.
[32] Ex W.

capital contribution and for the Debtor to borrow $1.2 million to make capital improvements to the Hotels.[33]

Prior to COVID-19, the Debtor never missed a payment to the Bank, nor did it ever commit a covenant default. Edward testified that governmental COVID-19 shutdowns beginning in March 2020 have dramatically negatively impacted the Hotels' financial performance. For example, October 2020 revenue was $1.9 million lower than October 2019 revenue.

Debtors have no 2021 renovations planned for the Hotels and Debtor's Plan confirms this fact. Any renovations planned by the Debtor are not to begin until 2023. Certainly, the Debtor is not planning to do a $3 million PIP as assumed by the Bank's appraisal. If Debtor were to do a $3 million PIP in 12 to 18 months, Edwards indicated the Hotels would need to shut down for that entire period.

Edwards discussed a January 16, 2020 Monthly STAR Report: Holiday Inn Bloomington[34] and a Monthly STAR Report: Comfort Inn Bloomington,[35] both for the month of December 2019. These surveys revealed that, from 2018 to 2019, the Debtor's Holiday Inn had a 26.2% drop in occupancy[36] and the Debtor's Comfort Inn had a 28.5% drop in occupancy.[37] Edwards blamed this pre-COVID-19 performance drop on the big increase in hotel room supply in Bloomington without a corresponding increase in demand.

Edwards noted that the Bank approached the Debtor in 2019 about possibly loaning more money to the Debtor so it could renovate the Hotels. A 3Q2019 financial statement was given to the Bank and the Bank commissioned appraisals of the Hotels. That loan prospect was off the table by 4Q2019 because of the dramatically reduced financial performance of the Hotels.

The Holiday Inn's restaurant was refreshed in 2018 and various other facility improvements were also made at that time. Edwards testified that the Holiday Inn presently has

---

[33] DE 117, Ex. 3.
[34] Ex. 11.
[35] Ex. 14.
[36] Ex. 11, tab "Summary."
[37] Ex. 14, page 3.

a valuation of $3.3 million for county tax purposes while the Comfort Inn's county tax value is $1.5 million.[38]

Edwards testified that the Debtor's Comfort Inn is worth "$20,000/key" (i.e., per room) or $1.3 to $1.4 million[39] and that the Holiday Inn is worth $2.4 million.[40] He believes neither of the Hotels will be back to 2019 RevPar levels for 3 to 5 years.

### B. Clemson's Testimony

Clemson is a manager at Kidder Mathews in its Phoenix office and has been with that firm for 15 to 16 years. He is an appraiser licensed in Arizona and California and, for the purposes of appraising the hotels, he is temporarily licensed in Indiana. Clemson has testified in bankruptcy and state courts about 20 times. Approximately 20% of his appraisal practice concerns valuations of hotel properties. He has appraised about 50 hotels. He has never been published nor does he possess the MAI appraiser credential.

In preparation of the subject appraisals, Clemson interviewed Debtor's competitors and market brokers and consulted numerous publications, especially STAR Reports. He visited all 10 competitive set hotels identified in his reports plus the Hotels themselves. Clemson categorizes the Debtor's Holiday Inn as a full-service hotel (food, beverage and meeting space) while the Comfort Inn is a limited-service hotel (no meeting space or restaurant and limited snack and sundries for sale on site). The Comfort Inn was built in 1974.[41] The Holiday Inn was constructed in 1980.[42]

Clemson noted that the hotel industry has been disrupted by COVID-19. RevPar has decreased by 50% or more at many properties. Even before COVID-19, however, the Debtor's Hotels experienced a reduction of about 30% in revenues from 2018 to 2019. The dramatic increases in Bloomington hotel room supply was the source of these revenue reductions.

---

[38] The Court finds that, while these valuations are interesting, neither of the county's tax values are the market value of either Hotel. In any event, Shah's reports indicate the county's assessed values are $1.9 million for the Comfort Inn and $3,891,200 for the Holiday Inn.
[39] $20,000/room multiplied by the available 66 rooms.
[40] $20,000/room multiplied by the available 118 rooms.
[41] Exhibit G page 17. But see pages 41, 69 and 123 where the construction date is noted as 1980.
[42] Exhibit H, pages 6 and 24

8

In reviewing Monthly STAR Report: Holiday Inn Bloomington[43] for the month of December 2019, Clemson noted that the Debtor's Holiday Inn showed a relatively high ADR but occupancy was quite low, suggesting that room rates were overpriced. In 2020, COVID-19 devastated the Holiday Inn's revenues. The Debtor's Comfort Inn performed better than the Holiday Inn but still showed a decreased RevPar by December 2019[44] and COVID-19 devastated revenues in 2020. He determined that hotel experts generally expect a 3-to-5-year period to lapse before hotel revenues will return to their 2019 pre-COVID-19 levels.

Clemson testified about the 3 valuation methods[45] but noted the Direct Capitalization Method utilized in the Income Approach[46] was not reliable when a property is not stabilized, as is presently the case with the Hotels. The Sales Comparison Approach was also imperfect because comparable sales could not be located nearby or near in time. The Cost Approach was completely disregarded by Clemson as he deemed it irrelevant.[47] Clemson relied on the Income Capitalization Approach in reaching the "as is" value of the Hotels. RevPar was the principal tool utilized in Clemson's valuations. His projected increase in occupancy was tied to the general consensus that it will take 3 to 5 years for these Hotels to recover from the impacts of COVID-19.

In discussing PIPs, Clemson noted there are two forms of PIPs: a capital improvement component (roofs, structural improvements, etc.) and a soft cost component (pillows, sheets, etc.). He noted soft costs expended do not increase a hotel's value. Capital improvements can give a hotel property an upward performance bump but, for the most part, capital improvements normally only help a hotel maintain competitiveness. The Comfort Inn has already completed about two-thirds of its last PIP. The remaining one-third involves soft costs and, therefore, will not increase the value of the Comfort Inn once those soft costs are expended.

Page 31 of Clemson's Holiday Inn appraisal was copied from Shah's report. Clemson used a 10% capitalization rate, a number a bit in excess of the national average of between 6%

---

[43] Ex. 11.
[44] Ex. 14.
[45] Cost Approach, Sales Comparison Approach, and Income Approach.
[46] Within the Income Approach, there is a direct capitalization method and a income capitalization method.
[47] Shah agrees. So did the appraisers in *Buena Vista Oceanside*, *supra* note 27 and *Hotel Associates*, *supra* note 28.

and 9% but still close to Shah's selected cap rates. This, therefore, produced a lower valuation.[48] Clemson maintains that RevPar is the most important metric in determining a hotel's value. Higher ADR will likely push down occupancy and vice versa. This is why overall RevPar is more important than artificially elevating ADR or occupancy, the individual components of RevPar.

Clemson prepared two valuation reports, one reflecting the Valuation Date fair market value of the Debtor's Holiday Inn at $3,010,000[49] and the other indicating the fair market value of the Debtor's Comfort Inn at $1,540,000[50] for an aggregate value of $4,550,000.

The Bank called one witness at trial. His testimony is summarized as follows:

C. <u>Shah's Testimony</u>

Shah is an executive director of Hospitality and Gaming and Sports and Entertainment in Cushman & Wakefield's Valuation & Advisory Division. He has been with Cushman since 2015 and is based in Columbus, Ohio. Shah is a Member of the Appraisal Institute (MAI), is a certified general appraiser in Indiana and 7 other states and has published 6 appraisal related articles. Virtually all of Shah's appraisal practice is devoted to appraising hotels. In the past 5 years he has appraised between 115 and 150 hotels per year, 65 in Indiana alone. Despite Shah's vast experience valuing hotels, he had never before testified in litigation.

According to Shah, the determination of the value of a hotel requires an assumption that the hotel is sold on the effective date of the appraisal. Upon the sale of a flag-licensed hotel, the buyer will need to renovate the property. This renovation will be in accordance with the terms of the licensor's mandated PIP. In both appraisals prepared by Shah, he assumes a PIP for each Hotel, to be completed within 1 year of the Valuation Date, at a cost of $3 million, $2.2 million for the Holiday Inn[51] and $800,000 for the Comfort Inn.[52] These renovations were assumed to be paid for from capital reserves and a capital contribution for the property owners.

---

[48] The higher the cap rate used the lower the appraised value.
[49] Ex. H, page 3.
[50] Ex. G, page 3.
[51] Ex. F, page 4.
[52] Ex. E, page 4.

10

Shah testified that the primary appraisal approach to hotel valuations is the Income Capitalization Approach.[53] He noted the Hotels are not currently stabilized.[54] He noted that sales comparisons are often very subjective, especially when comparing different markets. Hotel buyers do not generally rely on sales comparisons.

The market has been dramatically affected by COVID-19. Shah indicated the smaller "drive by" hotel markets like Bloomington have not been as hard hit by COVID-19 as big city conference hotels. He indicated that lowering ADR could spike occupancy, but that higher occupancy increases operating costs. Shah agreed with Clemson that RevPar is the most important metric in valuing a hotel. He also noted hotel guests have some level of loyalty to hotel brands, often because of points awarded by hotels to its customers.

Shah did not review the Debtor's Plan or speak with Clemson.

Shah testified that an "extraordinary assumption" would need to be made in any appraisal that does not assume a sale and rehabilitation of the property.

In April 2019, Shah valued the Comfort Inn at $3.8 million[55] and in October 2020 he valued the Hotel at $2.7 million.[56] In April 2019 Shah valued the Holiday Inn at $8.1million[57] and in October 2020 at $5.5 million.[58] Shah, therefore, valued the Bank's collateral in the aggregate at $8.2 million.

### V. DETERMINATIONS OF VALUE.

The question for this Court to decide is: what was the market value of the Hotels as of Valuation Date? Put in other words, what would a willing buyer, under no compulsion to buy, pay for the Hotels in the condition which these Hotels existed at the Valuation Date?

---

[53] In Exhibit E at page 60 Shah gives minimal weight to the Cost Approach when valuing hotels and also does not give strong consideration to the Sales Comparison approach because, in his experience, investors look to the financial performance (Discounted Cash Flow Approach) of the property and not these other two valuation approaches.
[54] Clemson agrees. As noted in *Windsor Hotel, LLC*, 295 B.R. 201, 210 (Bankr. C.D. Ill. 2003) the Appraisal Institute "stabilized occupancy or income is defined as occupancy or income at that point in time when abnormalities in supply or demand or any transitory conditions ceased."
[55] Ex. A, page 3. $57,576/room multiplied by 66 rooms equals $3.8 million.
[56] Ex. E, page 3. $40,909/room multiplied by 66 rooms equals $2.7 million.
[57] Ex. B, page 3. $68,644/room multiplied by 118 rooms equals $8.1 million.
[58] Ex. F, page 3. $46,610/room multiplied by 118 rooms equals $5.5 million.

11

Importantly, the Debtor's Plan does not propose to surrender or sell the Hotels. Rather, Debtor's Plan proposes to retain and operate the Hotels. *Sunnyslope Housing*, therefore, instructs this Court to value the Hotels at replacement value. This is consistent with the language of §506(a)(1), requiring that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property…" For this reason, even though Shah is imminently qualified,[59] Shah's assumed Valuation Date sales of both Hotels renders his appraisals defective, at least for the purposes of this Court's § 506(a) valuation. These defects are significant because Shah assumes a buyer of these Hotels will be required by the flag-licensors to promptly spend the collective sum of $3 million to satisfy PIPs which Shah contends these licensors would require. Shah also assumes the PIPs will be completed in 12 months without a needed closure of operations while construction proceeds forward. According to Shah, the $3 million would come from capital reserves[60] and capital contributions. However, the Debtor has no capital reserves for either property nor does its Plan contemplate a capital call for years to come and only then in a much smaller sum. Shah's hypothetical buyer's uninterrupted operations and hypothetical capital improvements to the Hotels then drive Shah's projected occupancy and ADR numbers upward thereby pushing his discounted Income Capitalization valuation all the higher. The Court finds Shah's assumptions unwarranted in the context of a §506(a) valuation of the Bank's collateral. Accordingly, this Court gives less weight to Shah's appraisals, more weight to Clemson's appraisals and some weight to Edwards' valuations.

A. <u>Valuation of the Comfort Inn</u>

Shah's appraisal notes that Star (or STR) "data is generally relied upon by typical investors."[61] Clemson and Edwards essentially agree with this notion. The three principal metrics reflected in Star Reports are a hotel's occupancy, ADR and RevPar and those of its competitors. Shah notes that the subject Comfort Inn's performance was reported by Star as:

---

[59] In fact, Shah's hotel valuation credentials are superior to Clemson's.
[60] $30,000 from the Comfort Inn and $62,000 from the Holiday Inn.
[61] Ex. E, p. 46.

12

Case 2:20-bk-09355-DPC    Doc 156    Filed 12/18/20    Entered 12/18/20 17:55:17    Desc
Main Document    Page 12 of 17

| Year | Occupancy | ADR | RevPar |
|------|-----------|-----|--------|
| 2018 | 64.5% | $96.80 | $62.50 |
| 2019 | 46%[62] | $94.24[63] | $43.47[64] |

Although noting the terrible market disruption caused by COVID-19, Shah projects subsequent Comfort Inn performance as follows:

| | | | |
|------|------|--------|--------|
| 2020 | 37% | $73.22 | $31.34 |
| 2021 | 42.8% | $80.07 | $46.31 |
| 2022 | 54.4% | $92.09 | $53.68 |
| 2023 | 58.7% | $99.45 | $59.99 |
| 2024 | 59% | $102.44 | $61.79 |

Using these projections for this 66 room hotel, Shah divines a 10-year anticipated cash flow and applies to those NOI's a discount rate of 11.5% and a terminal cap rate of 9.5% to produce a valuation of $2.7 million. He then uses "comparable sales" to gut check his discounted cash flow approach.

This Court finds Shah's occupancy and ADR growth unconvincing and overly aggressive. This Court finds the Comfort Inn's performance has been severely harmed by dramatically increased competition in the Bloomington hotel market. This fact is reflected in the financial performance from 2018 to 2019 producing a RevPar decrease of over 30%. Then, in 2020 the Comfort Inn's problems really began with the onset of the COVID-19 pandemic. Bloomington is a college town. Many students have left Bloomington to return home to advance their education online. Sporting events and other college gatherings have come to a standstill for most of 2020 and this will likely continue well into 2021. At the Valuation Date, there was still no sign of a vaccine and many were predicting an increase in COVID-19 cases as winter approached. By no means were occupancy rates or ADR rates stabilized. The Court finds that ADR and occupancy

---

[62] A 28.5% drop from 2018. See Ex. E, pp. 51 and 63.
[63] A 2.7% reduction from 2018.
[64] A 30.4% drop from 2018.

13

stabilization will not likely occur for 4 to 5 years. The Court cannot accept what it perceives to be Shah's overly rosy projections.

The Court does find Clemson's projections to be more probable. Clemson's appraisal[65] reflects more modest occupancy growth in the near future and a considerably more modest ADR growth over the next several years. To these revenue projections Clemson applied a 12.0% discount rate and a 10.5% terminal cap rate, both of which this Court finds to be close to Shah's rates but a bit too pessimistic. As to Clemson's comparable sales, this Court finds that his comparable sales are not truly comparable. This is reflected in the fact that Clemson made numerous significant adjustments for age, economic conditions and the like to somewhat artificially bring his valuation of the Comfort Inn more in line with his Income Approach valuation. Furthermore, the Court does quibble with Clemson's Sales Comparison valuation in another respect. On page 79 of 158 he concludes the "as is" value of the Comfort Inn is $2 million and then he subtracts a $520,000 "Lease-Up Discount." The Court could not find where he defines or explains the reason for this discount.[66]

This Court finds Shah accurately noted that the Sales Comparison Approach is not particularly useful or even widely reviewed by hotel investors. RevPar is what counts and it is the components of RevPar (occupancy x ADR) which drives Shah's and Clemson's valuations and which also drives this Court's valuation determinations.

Shah found the "as is" value of the Comfort Inn on the Valuation Date to be $2.7 million. Clemson found that value to be $1.49 million. Edwards testified he felt the hotel had a fair market value of $1.3 to $1.4 million. This Court finds the Comfort Inn value to be $28,000 per room x 66 rooms or $1,848,000.[67]

---

[65] Ex. G.

[66] It is worth noting that, without this so-called Lease-Up Discount, Clemson's Sales Comparison value of the Comfort Inn is quite close to the Court's value noted below. The Court also notes that Clemson did testify at trial as to what he meant by "Lease-Up Discount" mentioned in his appraisals.

[67] The Court takes some solace in this valuation by viewing Shah's $2.7 million value and subtracting his assumed $800,000 capital infusion into the Holiday Inn. This produces a $1.9 million value, just a small amount above the Court's number of $1,848,000.

14

B. <u>Valuation of the Holiday Inn</u>

Shah notes in his appraisal[68] that the subject Holiday Inn's performance was reported as:

| Year | Occupancy | ADR | RevPar |
|------|-----------|-----|--------|
| 2018 | 68.7% | $101.62 | $69.71 |
| 2019 | 47.6%[69] | $102.47[70] | $48.76[71] |

Shah projects occupancy and ADR to be stabilized in 3 years so he charted the following:

| | | | |
|---|---|---|---|
| 2020/21 | 37% | $88.75 | $32.84 |
| 2021/22 | 50% | $98.73 | $49.36 |
| 2022/23 | 54% | $108.04 | $58.34 |
| 2023/24 | 58% | $112.66 | $65.34 |
| 2024/25 | 58% | $116.04 | $67.30 |

Using these projections for this 118-room Holiday Inn, Shah calculates revenues over a projected 10-year period and then applies a discount rate of 11.5% and a terminal capitalization rate of 9.5% to produce an "as is" Valuation Date fair value of $5.5 million for the Holiday Inn. While he also does a sales comparison analysis, he admittedly does not put much stock in that analysis. Like Clemson, he essentially adjusts the so-called comparison sales to produce a sales comparison value for the hotel at a value near the discounted cash flow valuation amount. The Court largely disregards the sales comparison approach in the reports of both appraisers.[72]

As with the Comfort Inn, this Court finds Shah's performance estimates for the Holiday Inn to be overly optimistic. The Court finds that the Holiday Inn occupancy rates and ADR will

---

[68] Ex. F.
[69] A 30.7% decrease from 2018.
[70] A 0.8% increase from 2018.
[71] A 30.1% decrease from 2018.
[72] As noted above in the discussion of Clemson's Comfort Inn appraisal, the Court takes issue with Clemson's Sales Comparison valuation in another respect. On page 80 of 156 of his Holiday Inn appraisal, he concludes the "as is" value of the Holiday Inn is $3.86 million and then he subtracts a $830,000 "Lease-Up Discount." Again, the Court could not find where he defines or explains the reason for this discount. Without this so-called Lease-Up Discount, Clemson's Sales Comparison value of the Holiday Inn is almost exactly the Court's $3.9 million value noted below.

15

not be "stabilized"[73] in 3 years. Rather, this Court finds that post-COVID-19 stabilization is not likely to occur for either of the Hotels until 4 to 5 years after the Valuation Date.

Clemson uses a 12% discount rate and a 10.5% terminal cap rate.[74] His 5-year NOI projection begins with a 35% occupancy rate in 2020 and $75.00 ADR. He projects occupancy to jump to 52.5% in 2021 and then gradually crawl back to the 2018 occupancy rate of 63% by 2023. ADR, however, is expected by Clemson to gradually creep up to the 2018 ADR of $100 but not until the year 2030.

The Court was more persuaded by Clemson's valuation testimony than Shah's. The Court finds Clemson's NOI projections for both of the Hotels are more reasonable than Shah's projections, particularly in view of the keen hotel competition in Bloomington and in view of the likely near and long-term revenue damage caused by the COVID-19 pandemic. Edwards was a very knowledgeable and credible witness but the Court finds his valuations to be too light, especially concerning the Holiday Inn, a property with more amenities and one which should attract a greater ADR going forward.

The Court finds Clemson's appraisal report[75] to be more probable than Shah's report.

Shah found the "as is" value of the Holiday Inn on the Valuation Date to be $5.5 million.[76] Clemson found the value to be $3,010,000[77] while Edwards testified to a $2.4 million[78] value. This Court finds the value to be $3.9 million or approximately $31,000 per room.[79]

---

[73] The Court finds Shah's assumed stabilization of these properties by 2024 is flawed. The supply of competing hotel rooms in the Bloomington market has dramatically increased since the Debtor bought the Hotels so that, even before COVID-19, the occupancy and room rates (and therefore net income) has been greatly disturbed. When COVID-19 arrived in Bloomington in March 2020, income at the Hotels was decimated. It will take a long time to recover from these two market shocks.
[74] Ex. H, p. 110.
[75] Ex. H.
[76] $46,610/room x 118 rooms.
[77] $25,508/room x 118 rooms.
[78] $20,000/room x 118 rooms.
[79] As with the Court's Comfort Inn analysis, this Court took Shah's $5.5 million valuation and subtracted his projected $2.2 PIP amount for the Holiday Inn to produce a $3.3 valuation, a number not dramatically different than the Court's $3.9 valuation for the Holiday Inn. These equations are admittedly rough gauges, but it does give the Court the sense that Shah's valuations would be significantly lower (and much closer to Clemson's) if he was required to value the Hotels without assuming Valuation Date sales and $3 million in PIP's invested promptly thereafter.

Case 2:20-bk-09355-DPC    Doc 156   Filed 12/18/20   Entered 12/18/20 17:55:17   Desc
Main Document    Page 16 of 17

## VI.　CONCLUSION

Debtor's Plan does not propose a sale of either Hotel. Rather, the Plan proposes that the Debtor will retain the Hotels and restructure the Debtor's obligations over an extended period of time. Shah's appraisals of the Hotels are, therefore, fundamentally flawed in the baseline assumption that the Hotels are sold on the Valuation Date and would be required to embark into a PIP of $3 million[80] to be completed within 1 year. The Bank failed to meet its burden of proof that the Hotels are collectively worth $8.2 million. The Court looks more to the Clemson valuation reports and determines that the Valuation Date market value of the Comfort Inn was $1,848,000 and the Holiday Inn was $3,900,000.

**DATED AND SIGNED ABOVE.**

---

[80] $2.2 million toward the Holiday Inn and $800,000 toward the Comfort Inn. See Ex. E, page 3, and Ex. F, page 3.

17